Good morning, Your Honors. My name is Jennifer Yim on behalf of the appellant Gary Hanneman. At this time, if I may, I'd like to reserve two minutes for rebuttal. Your Honors, Mr. Hanneman was in custody on February 23, 2001, when Detective Holliday told him that she knew that he had inappropriately touched Joey Gia Minor. She specifically said to him, he said, Joey told us that you ejaculated on him, and we know it happened, we know you touched him, we want to know how many times it happened. It was not a question as to whether it happened, it was how many times, give us the details. At that point, a reasonable Counsel, could you pull that microphone a little closer to you, let's see if we can eliminate, you're fading in and out. Is that better? No. Is there anything we can do about that? Just a little bit. Okay. I don't think it's your voice, I think it's the equipment. Your Honors, at that point in time, a reasonable person in that situation would not feel free to leave. A person would not feel free to terminate that interrogation and walk out that door. In fact, Mr. Hanneman requested to leave. He said, can I leave? Can I come back to you? Can I think about it? You don't want to misquote him, do you? He said, he specifically said, can I come back to you? I know, but you said, he said, can I leave? Well, I would suggest that that meant... No, but the record doesn't reflect that he said, can I leave? He said, can I come back? All right, that makes a difference. Yes, but Detective Holliday testified at the evidentiary hearing that she knew that that's what he meant, that he wanted, that when he said those words to her, he meant that he wanted to leave. And instead of saying, sure, go ahead, you can leave, as she says he was free to do at the hearing, she didn't say that to him. She said, we know you're not going to come back. We know something happened between you and Joey. Tell us the details. Not in those words. We know you're not going to come back doesn't mean you can't leave. Your Honors, she said... They said up front, you can leave any time you want. And that's true. And he never got up and left. Well, Your Honors, that's true at the beginning of the interrogation or the interview. She did say, you're not under arrest, you're free to leave. That was at the very beginning. I would argue that at the point where she's accusing him of touching a minor, at that point, it's a different situation. He's not free to leave. Being accused of something doesn't mean automatically you're now in custody. I've never heard that rule. That's an interesting rule. As soon as I say, you know, you did X, now all of a sudden you're in custody. Period. The end of the story. That's an interesting bright line rule. What case supports that? Your Honor, I would not argue that that is a bright line rule. I would argue that in this situation, you've got to look at the totality of the circumstances. And at that point in time, he knew that they had evidence against him. That a minor child had talked to them and told them that he had touched him. Counsel, these arguments seem well, you know, well made to the Nevada Supreme Court. We're here on EDPA review. So did the Nevada Supreme Court err in any of its recitation of the law? No, Your Honor, the court applied. Then if it didn't err in its recitation of the law, then you have to be able to show to us that they have unreasonably interpreted the facts. So what fact did they just wildly get wrong? Which means that no rational, reasonable jurist could possibly decide the case the way they did. And certainly not the members of the Nevada Supreme Court. Yes, Your Honors, when you look at the Nevada Supreme Court's opinion, they talked about the early circumstances in terms of, you know, the cops were not in uniform. They were in an unmarked vehicle. He went voluntarily. All those things are true. The problem is when they looked at the, made the determination as to whether he was in custody, there was no discussion about, well, what really happened in those two hours before he confessed? There's no discussion of the pressures applied to Mr. Hanneman. There's no discussion about the fact that they presented him with known facts about his actions with Joey and They presented him with no facts? The Nevada Supreme Court did not discuss the fact that Detective Holiday presented Mr. Hanneman with known facts. And what's the problem with that? I don't understand what the problem is. And why, I mean, it's clear that the Nevada Supreme Court looked at this record. It's pretty clear from looking at their, and I've now looked at the record. So what should the Nevada Supreme Court have looked at that would have changed their minds? Well, I think the fact that for two hours they were accusing Mr. Hanneman of touching Joey and Is that unusual process on the part of the police? Excuse me, Your Honor. Is that unusual that the police would do that? Well, I don't think it's unusual, but this wasn't a situation where they were asking him if he did something. They told him, we know you did it. We want to know the details. And is that unusual process on the part of the police? I would argue that it, in that situation I've read a lot of transcripts. That's not unusual conduct by the police. And I'm not aware of any case that's ever held that that kind of conduct crosses a constitutional line. In fact, the police can say all kinds of things to people. They can. They could even lie, and these officers didn't lie, actually. They can, Your Honor. The only thing they knew was that Joey had said so. And that's what they told him. Joey said so. We believe Joey. And I would argue that a reasonable person in that situation is not going to feel free to terminate that interrogation and walk out the door. Why not? If you stood there and accused me right now of having done some evil thing, I might say, I'm sorry, I don't want to listen to you. I'm walking out the door. I don't understand why you wouldn't feel free to leave. The fact that they believe Joey is irrevelant. They weren't going to arrest him at that point. But he did reference leaving, and she didn't say, you can leave. She said, we can turn this into an all-nighter. And then later on, he said three more times, I need time to think. She didn't say, okay, go ahead, leave, come back after you've thought about it. I need time to think does not necessarily mean I'd like to get up here and leave this place for the next ten days or five days or one day. It just means, I need time to think. I'm going to make a decision right this minute. So then they say, can I go out to the bathroom? Sure. Off he goes to the bathroom. And he comes back and they say, do you feel any better? Nope, don't feel any better. If he had said, I need time. He could have walked right out then, couldn't he? No. Why not? Who was guarding the bathroom not to let him go out? Excuse me, the bathroom? Yeah. He walks out of the bathroom. The bathroom's not attached to this little interview room. It's down the hall somewhere. He walks out, decides to walk out the door. Your Honor, first of all, I would argue that it was a supervised bathroom break. He requested to leave. They didn't just let him walk out that interview room. She went and, well, Detective Holliday stated that she cleared the bathroom to make sure there was no janitor in there because the cleaning crew comes around that time. She said, and then she left, as far as we can tell from this record. And he came back. I still do not believe that he reasonably could have believed that at that point he was free to leave. Do you have any case that supports your argument? This is not an unusual situation. This is the way the police conduct a lot of interrogations, is that you have any case that supports your claim that somebody in those circumstances where they're talking with the police gets up, can walk down the hall to the bathroom, come back, gets a glass of water, is told he's free to leave. Nevertheless, the psychological coercion is so strong that it violates the Constitution. Do you have a case for that? I do not have a case with these exact facts. But I do have cases that talk about when officers present an individual with known facts, with evidence of guilt, that a person in that situation is not going to reasonably believe that they can just walk out that door. But the fact that we don't have any case that this is very standard police behavior ought to tell us something, doesn't it? Doesn't it tell us that the Nevada Supreme Court was not wildly wrong in the way that's required by AEDPA in order for us to grant relief? Well, Your Honor, I think we have cases that, for example, the Ninth Circuit has cases that talk about the duration of an interrogation or interview. And here, he was questioned and accused for two hours when Detective Broom came in the room. And Detective Broom again accused him of touching Joey. He said, we know a lot more than you give us credit for. And it was shortly after that point in time that Mr. Hanneman confessed. So it's not just, you have to look at all the circumstances. You have to look at the fact that he's in an interrogation room, not at the school where he offered a conference room. They said, no, we want to talk to you at our offices. So he goes back there, he's separated from anyone he knows for two hours, and he's accused of touching Joey and potentially other children at the daycare. Is it significant, or should it be significant, the way he got there? The way he got to their offices? Yes. Your Honor, I will concede that he voluntarily went with him to the offices. He drove his own car. But I think there's a distinction between presenting yourself. All I'm asking you, I don't want you to concede you are representing your client. I'm just asking you, is it significant? The answer to that can be the yes or no. It's a factor. It's a factor to be considered in determining whether Mr. Hanneman was in custody. So whether it may not be a factor that weighs in favor of custody, but you have to look at that factor next to all of the other factors. No, doesn't it do more than just not figure in favor of custody? Doesn't it argue against custody? They could have put him in their car and driven him down there and still argue that he was not arrested and free to leave. But they, not only did they, he got in his own car and he drove to the site. He did. He voluntarily went. It's pretty hard for somebody under those circumstances to think at that point they're under arrest. So at what point was he under arrest so far as you're concerned? I argue that he's in custody when he's told that Joey has gone in there and told the officers that Mr. Hanneman has touched him, that he has. . . What makes him in custody at that point? Because a person sitting in that situation being told that he has committed sexual acts against a three-year-old minor is not going to reasonably believe that those officers are going to just let him walk out that door. They weren't going to just let him walk out the door and go back to work. They thought that in their minds he had touched Joey and there were possibly several other children that he had touched. And what clearly established Supreme Court case tells us that? Well, Your Honor, the Supreme Court . . . So that no rational jurist could disagree with you. I think there have been a lot of irrational jurists on this case so far. So if three more get added, that might be horrible. But the point is, what you really have to convince . . . I'm being a little bit facetious about it. No rational jurist could possibly decide what these other judges have decided. That's what you're saying. I am saying that. And I don't think the Nevada Supreme Court looked at . . . I think they stopped at he went there voluntarily. She told him that he could leave. They weren't at a police station, were they? They were not. They were at these detectives, I believe seven detectives and a sergeant, worked out of the offices at the Reno or Washoe County Social Services Complex. So I admit it was not . . . he didn't drive up to the police . . . Mr. Hanneman has a college degree and has taken classes in criminal justice. Yes, that is in the record. He graduated, I believe, in 1991. He did admit to taking a course in criminal justice and criminal law, I believe. That was 10 years before he was sitting in that office with those detectives. You're asking me how many years it's been since I was in law school. If you think that's significant, I'll tell you it's more than 60. And, Your Honors, 10 years is a long time. And to assume . . . because he didn't testify that he knew. He specifically said, I didn't know I had the right to an attorney at that point in time. So to assume that simply because he took these two classes . . . But later on, they interrogate him on subsequent days and they ask him, Do you remember the rights that we read you? Yes, he understood them, and yes, he was willing to talk to them. So certainly in subsequent conversations they had with him, he was well aware of what his rights were. Well, Your Honor, I would argue the Miranda warnings that were given to him after he confessed to touching nine children, those were not effective warnings. At that point in time, they had broken him down. He had been sitting there for over two hours. He had confessed to touching all of these children. And then, finally, she says to him, Well, things have changed. You're under arrest. You're not free to leave. At that point in time, those Miranda warnings are not effective. What reasonable person in that situation, after confessing to what he confessed to, is going to say, You know what? I have the right to remain silent now. But, the suppression of the subsequent days on which he testified, or on which he was interrogated, is not before the court in this case, is it? It's the initial interrogation that's really in play before us. Well, he did confess to touching additional children on the 27th, and I do believe that that is also before this court. After they Mirandized him, he made some more confessions. He confessed to touching an additional child. Four days later, they approach him at the county jail and they say, We want to talk to you again. They bring him back to the offices, and they say to him, Remember those rights that we told you about on Friday? Well, those are still in effect. You have the right to remain silent. There was no mention of the right to counsel. And, I'd like to point out, I'm not trying to raise a new issue, but Mr. Hanneman was booked on Friday, the 23rd. This is on Tuesday that they approach him again. I don't know why he hadn't appeared in court at that time, but he hadn't. So they said, Have you appeared in court? Do you have an attorney? And he says, No, not yet. Now, had he been arraigned before that Tuesday interview, he wouldn't have confessed to touching eight more children. He wouldn't have said anything else because he would have had counsel, and counsel would have told him to not say anything. I find it a little bit convenient that on that day they didn't tell him that he had the right to counsel. They left that out. They told him he had the right to remain silent. And I would argue that those are inadequate. They want us to assume a lot of things that we can't assume because records won't support it. Sometimes lawyers advise their clients to make a clean break, to tell the truth, so that they can get into treatment rather than into the penitentiary. We don't know what they would have advised him. We can't say, and we aren't going to make the record by suggesting. But you are giving us your version of what, and we have to say we don't know that unless you can tell us somewhere in the record that we see it. And I don't think you can, can you? All I can say is that he was not advised that he had a right to counsel at that point in time on the 27th. Counsel, you've consumed your time. I'm going to give you one minute for rebuttal because you did ask for rebuttal time.  And let's hear from the government. May it please the Court. My name is Deputy Attorney General Daniel Roche from the Nevada Attorney General's Office, and I have the privilege of representing the respondents in this matter. As was already covered, the question before this Court is whether the Nevada Supreme Court's determination that Mr. Hanneman was not in custody was an unreasonable application of clearly established federal law as determined by the United States Supreme Court. It wasn't contrary to. They applied the correct totality of the circumstances standard, and it wasn't an unreasonable determination of the facts. Each of the facts that they based their decision on are in the briefs with a citation to the record, either in the transcript itself or in the four-day evidentiary hearing that was held, that supports each of their factual determinations upon which they based their decision. So the question is, did they unreasonably apply clearly established federal law? And that question is answered in the U.S. Supreme Court case of Yarborough v. Alvarado from 2004. It was exact same circumstances. There were different facts, but it was a custody determination in California. The state court decided he was not in custody. The panel of the Ninth Circuit reversed and disagreed with the state courts and said, no, you were unreasonable for deciding that he was not in custody. And the United States Supreme Court reversed that decision, stating, firstly, when you apply a broad test, then the state courts are granted broader leeway in their decision. There's not a broader test than the totality of the circumstances. A Miranda custody case affords the state court making that decision the most leeway that I can think of in their determination. And therefore, unless they were just wildly wrong, you can't grant relief under EDPOT. And that's the case that we have here. I think if you took the briefs on their face and gave them the most persuasiveness they could have, what they would establish, what petitioner's briefs would establish, is that possibly the Navashman court could reasonably have found him in custody. There are a few factors that arguably support a custody finding. But the majority of the factors, and I'm not going to list them off right now, but they're in the briefs with citations to the record, the majority of the factors support a finding that Mr. Hanneman was not in custody. The other question before this court is whether his confession was voluntary. The state court who held the evidentiary hearing watched the videotapes of these interviews and said, in his own language, well, I don't know if I can find it. But he said it was abundantly clear that the defendant was voluntarily present at the interview and wanted of his own free will to continue the discussion with the police officer. One of the anecdotes from the interview that supports that is after he confessed to molesting several children and videotaping that, he was told he was under arrest. They asked him to waive the ability to go search his apartment and find the videotapes. And as they were leading him out, he said, oh, by the way, I forgot, I also molested this other child. And he listed more children off. It's clear that what weighed on Mr. Hanneman was his own guilt. He ultimately confessed to molesting over 20 children. He had videotapes of it, photographs of it in his apartment. He voluntarily confessed to those crimes. And for those reasons, and because the Nevada Supreme Court's determination that he was not in custody, was clearly reasonable under AEDPA, I would ask you to affirm the decision of the district court. Thank you, counsel. Ms. Yim. Thank you, Your Honors. I just would like to point out, the Nevada Supreme Court, when they affirmed the district court's decision, they said that while the interview was accusatorial, Mr. Hanneman was consistently told that he was not under arrest, could leave at any time. That makes it sound like he was told over and over and over again. That's not the case. The court did not review the entire interrogation, the circumstances surrounding Mr. Hanneman and Detective Holliday, and what really went on, the facts. And I would argue that based on that... Have you found any case that requires even telling him once, you're free to leave, you're not under arrest? That means that they're not in custody? No. You're saying they only told him so many times. And I'm asking you, do you know a single case where they don't say you're not under arrest? Nobody tells you you're not under arrest. Nobody tells you you're free to leave. And yet the circumstances cause a court to determine they were free to leave. I see my time is up. Go ahead. Your Honor, a lot of times they tell them that they're not free to leave. And a lot of times they say, you know what, at the end of this interview, we're going to let you go. And they do in fact let him go. That's not what happened here. He was not free to leave. After he confessed, they arrested him. Okay. Thank you, counsel. We thank counsel for the argument.
judges: Farris, Fernandez, Bybee